Next matter on the docket is Isbell v. DM Records All right, Mr. Brown. That's a lot of binders. It is, Your Honor. There's a lot of stuff to talk about today, hopefully. Good morning, Your Honors. May it please the Court, I'm David Brown on behalf of the appellant, DM Records. And there are three main points I'd like to cover today. And first has to do with California law, and this case involves a contract applying California law, and how California contract law works. And what happened here is that the trial court disregarded controlling California precedent and failed to allow the jury to resolve a conflict in the extrinsic evidence that was admitted to interpret the musical composition assignment agreement. What exactly was that conflict in the extrinsic evidence? Okay, well, there's a list, actually, of things. But I'll give Your Honor some examples. And in the transcript, the counsel at the time for DM went through a long list, and I cite that section. But for example, Belmar Records was the entity that was accounting for composition licensing royalties, which is found at Record Excerpt 130-137, tab 11 in our book. When tag team's auditor, and this is Lynn Levy of Arts, Entertainment, and Media Management, wanted to investigate the status of the tag team royalty payments, she wrote to Belmar. She didn't write to Albertus Isbell. And that's found also in the record at 1440545. That's extrinsic evidence, but they weren't disputing the authenticity. They were just disagreeing with the inference from that. Well, correct. They were disagreeing with what all these things meant. Yeah. And that's exactly what I understand that California courts say will be decided as a matter of law. Well, when in California, when you have a question of extrinsic evidence, and there are conflicting interpretations of that evidence, which there could be here, then what should be done is the jury should hear that, and basically the judge is supposed to direct those questions to the jury for jury resolution and then complete the contract interpretation. What case stands for that? I thought that's the opposite of what cases like Parsons say. I would cite the court for one of the leading cases out there. It's Morey v. Vannucci. Is this in your brief? It is. Morey v. Vannucci? Yes. It's 75 Cal Reporter 2nd, 573, and it's from the Court of Appeal of the 1st District, which is up around the Bay Area out there. And basically the situation here is that a company had both a trucking line and a cement plant, and they wound up, they sold the cement plant, and they entered into a contract whereby their trucking line would continue to transport cement for the buyers as part of the consideration for the contract. And the reason I would say the contract is particularly on point is because the term that came into contest was the term affiliated entities. And basically what happened is that after the company bought the cement plant, they gradually, the trucking company, got less and less work because they were allowed to use their own trucks and employees or affiliated entities. And instead of basically using the folks that had sold the factories and kept the trucking company, they went the other route, and they used independent drivers pulling their trailers. And they said, oh, these are our affiliates. And so what happened was they got sued, as you can imagine, because there was a dispute about that, because basically the plaintiff took the position that, no, that's not what this is all about. Basically, affiliated means trucks you own. Did that case have both sides to the contract, the contracting signatories, testifying? Both sides did testify. So that's a pretty big difference, because then you do have a credibility determination. In your case here, the only person who signed was, that testified, was Bell. But one of the things that the Morey Court specifically recognized that should be taken into account, and it's found at page 978 in the Cal Recorder, is they looked at the signatory with the subsequent conduct of the parties. That's one of the things that is studied in California, to see exactly what was done. And much of the extrinsic evidence here had to do with the subsequent conduct of the parties, which there was lots of evidence on. And so we had a situation here where DM Records had testified that Tag Team had dealt with them all these years, as if DM Records was the owner. We had evidence that DM Records had reported to Tag Team for royalties. Tag Team never wrote back and said, hey, why are you doing this? We don't think you own this. Tag Team was perfectly aware of Al Bell's existence, didn't have a thing to do with him. And after Bellmark, basically what wound up happening is, after DM Records bought Bellmark, Tag Team, that would be in a great position to know, followed right along with exactly what DM Records believed, that being that DM Records had acquired the composition copyright as part of its purchase of the Bellmark bankruptcy But those assets were undefined. Those assets, well, the assets were actually not undefined. If you look at the bankruptcy transaction, and this is one of the defendants' exhibits, I have the exhibit binder here with me, it actually speaks directly to composition copyrights. And the trial in many respects wasn't so much about whether those assets were defined as whether it was simply basically a quick claim without any representations. So it's not that, you know, if this were a case, it's not as if the contract said, you know, it just said any machines in your garage. The contract said any lawnmowers, any tractors, any plows, this and that. And this clearly But as is wherever is without warranty as to title. To the extent, exactly, to the extent that they are owned by the seller. Exactly. And so in that scenario, it's easy to understand how it would be that when you acquire the rights, because we have both during the time of Bellmark's ownership of the composition copyright, we have evidence with Al Bell in charge, fully able to do whatever he wanted to do with Bellmark. Al Bell was treating those composition copyrights as if Bellmark owned them, not him. Now, obviously, when there was a parting of the ways with the bankruptcy situation, Al Bell was still in charge at first, could do whatever he wanted with the bankruptcy case. What was the purchase price from the trustee? I'm sorry, Your Honor? What was the purchase price from these assets? I believe it was $165,000. And what did you get for that? I understand you say you got, you're fighting over part of it. What else was involved? They got composition copyright in a group of other songs that were owned by Bellmark. Actually, quite a few songs, as well as the master rights, which are basically the sound recording copyrights, and they would have likewise rights to other things that, for example, Bellmark had the right to exploit, so they would get things like the right to use the artist's license, the likenesses, and that type of thing. Part of it is spelled out in the memorandum agreement. There were other assets. It just happens that this case has come down mostly to a fight about the whomp asset. Prior to the 10B motion, when specifically did you ever argue the twin assignment theory? Can you point to a place in the record? There is not a place in the record that we specifically argued the twin assignment theory at all. What happened in the record, and the record is clear on this, that based upon the belief at the time, the fact that when you look at the second, the and 50 percent, it's very clear that it deals with the assignee, and that is defined. The assignee is defined as the party to the contract, the memorandum agreement, which was only Bellmark, not Al Bell. Counsel at trial, naturally, looking at the assignee being very specific to Bellmark, believed that the top 50 percent must be referring to the same 50 percent. However, in fact, once the court made the decision that no, the top 50 percent is not Bellmark, it's somebody else, and we're going to try to figure out who, at that point it becomes obvious that you actually have a 50 percent assignment to Bellmark, and that has to be interpreted as part of the contract. And one of the things that's disturbing about this is if you look at the top clause, that 50 percent, then you have your second clause. The rights in between the two are not parallel. The second clause has more limitations in there. And then when you go down to the bottom, you get to the third main paragraph of Exhibit B, what you find is a scenario where basically you have a list of all the rights and remedies that you would have to enforce this thing against others. And it's very important to note that the alternative pluralization in there, over and over it has alternative pluralization, which means that either both assignees or one could enforce those rights. And it needs to have that in there, because for this particular assignment, the way it's drafted, the rights in the top 50 percent are broader than the rights in the second 50 percent. But when the district court questioned you, you said they are one and the same. Well, what happened at the district court was until the district court interpreted the contract otherwise . . . No, but before, before that ruling came down, there is the colloquy, and you emphatically say they're one and the same. That colloquy was said, yes, during the course of the Rule 50 arguments and before anyone knew how the court would interpret this. And no question was ever submitted to the jury. One of the things that should have been asked to the jury here is, is Bellmark's designated affiliated publisher, does that refer to the assignee of the second paragraph? Because the court's interpretation is hopelessly in conflict. And a jury could make that decision under California law and decide that type of disputed fact based upon extrinsic evidence. But a judge should not. That should be the basically typical of like a special interrogatory verdict is how it would work. And that's what should have been done here. And there was simply no reason not to do that here. The jury had heard 11 days of testimony about many years of history. And so the jury was in the best position to decide yes or no, what does this mean? An interrogatory verdict would be perfect to allow the jury to say, and commonly done in intellectual property cases, very commonly done, because there are It would help me if you might save a little time to discuss whether or not Tag Team would have to pursue Bell or you, the third-party question on sort of double recovery. Well, there is a double recovery issue here, that's for sure. But one of the issues is what should Tag Team pursue? Let's assume the jury instructions didn't, in other words, jury instructions said 50 percent, but they come back, your position is 100 percent. What's the case law that governs that predicament? Very specific case law that you can only collect, only get a copyright judgment for the portion that you own. You cannot have nominees in copyright cases collecting judgments on behalf of others. If this were a contract case, for example, if we were in a scenario where there was a suit under a agreement that had separated the actual copyright from the individuals and they just had an income participation, in that scenario, you could argue that perhaps contract would allow you to recover for someone that was part of that contract if you had that right in the contract. But the actual copyright statute is very, very specific. And so what winds up happening is in order to initiate and continue actions on copyright under Section 501 of the Copyright Act, you've absolutely got to be the owner of exclusive right, either legally or beneficially. What if you're the administrator of it? Administrator is not a legal or a beneficial ownership of that right. And so what, I ask you, your best case for that proposition? There are a series of cases, and a lot of them deal with the issues of, very commonly, this is in the recent cases about photographic assignments, where Internet catalogs build up copies of copyrighted photographs. And with that, the photographer keeps his rights but allows the Internet company to sue based upon the idea that they have the copyrighted photographs. When you say there are a series of cases, are they in your brief? And, your Honor, I would take just a moment. That's right. Keep going. One matter that I really wanted to cover was also the matter of the assignment that was uncovered after trial. Because, very briefly, what happened here is DM uncovered, basically during the course of the trial, they requested all documents that showed that Mal Bell owned that composition assignment. And he answered, already produced. Very believable. Because he had produced other assignments, and one of them had been up before the Fifth Circuit on appeal. Let's say, just because your time's out, I think where you're getting to, in 2006, he's already assigned it. How does that in any way relate back to the standing he would have to sue in 2002? It relates back because if you take the 2000 Exhibit B document, which is one of the loan documents that was part of the package, and that is something that was produced, but without the rest, you wouldn't see its significance. That transfers specifically the rights to sue. So that right to sue transfer was in place from 2000, two years before this case was brought. So, in reality, Al Bell was not the party in interest at the time of this trial. Al Bell was not the party in interest. And the facts of the matter are that we wound up with a classic situation. The first time that Your Honors examined the situation, and Judge Higginbotham was on the panel at that time, you looked at an assignment and determined that, were it not for the fact that the first paragraph assigned only 50 percent, the assignment of rights in the second paragraph to all rights to sue was sufficient, would be sufficient to extinguish Al Bell's right to sue. Because the trial judge had already dismissed on that basis. And in this case, when you look at that assignment from 2006, and you look at the collateral documents it assigned, there's no 50 percent. It's all of his rights. So, to me, it's very clear that law of the case here would require that it be found that Al Bell not be a person in interest to sue and not be an appropriate party to the case at the time of trial. Thank you. Thank you. We have some time for a vote. Mr. Bush. Good morning, Your Honors. May it please the Court, my name is Richard Bush. I'm going to address one or two of the things that were on the panel's mind to begin with. First of all, with all due respect to opposing counsel, he's misstated California law. So, under California law, contract interpretation remains a question of law, even when there are no material factual disputes as to what is called foundational extrinsic evidence. And that's the Bay-D-V Bank of America case, among other cases. And what foundational extrinsic evidence is, that relates to disputes over the historical facts at the time of contracting. Whether a letter was sent, whether a comment was made that shed light . . . Contemporaneous with the authorship of the contract? Yes. Contemporaneous at the time of the contracting.  It's called historical foundational extrinsic evidence. And you just cited your best case. What about his case, Maury? Well, that case, again, Your Honor, relates to a dispute between the contracting parties at the time of contracting. Okay. But why . . . once Bell takes the stand, isn't his credibility automatic? No. There's no dispute. In other words, they had 10 years. This litigation was going on for 10 years. Well, Bell says, I gave it to my publishing company, and they're . . . No, no, no. No. I'm sorry. No, you go. Okay. The difference is what historical foundational evidence and what a dispute as to foundational extrinsic evidence would be, would be if tag team were to get up and they were to say, oh, no, we didn't discuss it. You say we discussed it. We didn't discuss it. I didn't understand that. I understood something different from our conversation. That was not discussed. That would be the type of dispute as to foundational extrinsic evidence that would create a jury question. But there was none, because the only party to testify . . . At that point, there's a credibility issue. There's no credibility issue . . . Well, if there is that kind of testimony . . . Exactly. But there was none, because even though this litigation was pending for literally ten years, and even though they had claimed they had a relationship with tag team, they did not call them, they did not depose them, they did not put them on the witness stand, they did not put them on their witness list. Do they still exist? Yes, they do. In fact, they brought them to the courtroom. They were sitting in the courtroom at the time. They heard Mr. Bell testify, and they were not on the witness list, and they could not testify. So . . . Is Mr. Bell going to pay the royalties to the tag team? Tag team . . . well, that goes to another point. Tag team was unrecouped by Bellmark for millions of dollars. That's why DM Records never paid them. They assumed and never paid tag team anything. But to answer Your Honor's question . . . Well, that question . . . I'm more interested in her question. Okay. The question . . . If you prevail, will you be paying tag team 50 percent? If we owe tag team 50 percent, but they still have an . . . It's a different question. They have what's called an unrecouped balance. Because of all the sampling claims, because of all the advances that were made . . . Made by who? Not you? No, no. Made by Mr. Isbell. Made by Bellmark Records. There was cross-collateralization of advances that were paid. There were sampling claims. Albert Music had to pay $600,000 to resolve a sampling claim on . . . There it is . . . to Emergency Music. We talk on what, $160,000? What's their half? If tag team is entitled to half of the royalties . . . If tag team was entitled to half . . . Mr. Bell gets 100 percent. Well, because he's the . . . The administrator for tag team. Exactly. Right. They're the administrator. If tag team is owed the money, because their balance has been recouped, then they will get half the money. That's the way it works in music business. You're talking about the computation. Yes. You're talking about a mathematical computation. I'm talking about a mathematical computation. Okay. So, let me go . . . if I can step back for a second. So, there was no dispute as to credibility at the trial, because no one testified contrary to Mr. Bell's testimony. So, there was no dispute on foundational extrinsic testimony. What the California law also says, however, is that the possibility of conflicting inferences . . . actually conflicting interpretations from those inferences . . . signifies a necessity of assuming that responsibility, and that's the medical operations management contract. So, what happens is, if there's no dispute as to foundational extrinsic evidence, which there is none here because tag team didn't take the stand, all of the things they are saying, which is post-extrinsic testimony, that is for the court to interpret the inferences . . . Even if they put an expert, what's his name, Mr. Fox on? And, exactly, even if they put an expert on. It is for the court to determine the inferences to be drawn from non-foundational extrinsic testimony under California law. So, I wanted to get that right at the beginning, because that's very important. I think it's also important, Your Honors, to step back for a second and understand this. This litigation was pending for 10 years. This lawsuit was tried over the course of 11 days. The issue at the trial was whether the recording agreement, and Exhibit B of the recording agreement, transferred 50% of the musical composition from tag team to Albert Music, or whether tag team transferred 50% of the composition to Bellmark Records, the party that DM acquired. What was undisputed at the trial, what was undisputed during 10 years of litigation by the parties, was that tag team owned the other 50%. It was never in dispute. What's your best trial? Citation for that? Yeah. Okay. Just happened to have that. Okay, good. So, at trial, Mr. Watson, a principal of DM Records, testified as follows. The question was asked to Mr. Watson, and you would agree, would you not, with the statement that DM alleges the compositions were never owned by Albert, but only by Bellmark, and that Albert's only connection to the composition copyrights may have been as an administrator of them on Bellmark's behalf. You would agree with that statement. Answer, yes. So, if Albert never owned 50%, if only Bellmark owned 50%, then tag team necessarily owned the other 50%. Furthermore, during the trial, Mr. Wolfe, who was representing DM at the time, stated specifically at record 14-405-45, 108-78, that, in fact, it's the same 50%. It can only be the same 50% when discussing the fact that there was only one assignment of 50% from tag team in the contract. That second reference doesn't say tag team necessarily has 50%. It doesn't say tag team. It just says 150%. So the best record site you have for Bellmark acknowledging that tag team gets 50% is the first one. Is the first one. And also in their Rule 50 motion, they say over and over and over again in the Rule 50A motion, that only 50% was transferred from tag team and was transferred to Bellmark. That is said one, two, three, four, five different times in their Rule 50A motion. Mr. Wolfe again says at citation 14-405-45, 108-88, 108-92, that he says that Bellmark owns 50% and Albert owns zero. There's only one transfer is fundamental to that argument. So it's said over and over and over again during the course of the trial. So at no time during this entire litigation until they lost did they claim there was this dual transfer. So after the trial, after switching lawyers, and after ten years of denying Albert owned any portion of WOMP, and not only, I have to say, did they deny that Albert owned any portion of WOMP, but I think it's important to note that for, and I want to direct Your Honor's attention to record 14-405-45 and 9570. When Albert, after his bankruptcy, wrote to BMI and said I own this composition, it wasn't a Bellmark asset, DM had their lawyers write Mr. Bell a threatening letter, threatening him with litigation if he made any claim whatsoever to owning WOMP. There it is. It's in the record, and it is a letter that was a threat of litigation if he pursued it because they claimed that Bellmark, not he, owned the composition. Furthermore, as I pointed out at the trial, they concocted a document that they sent to the world claiming that Albert, not Bellmark, sold them WOMP. There it is. So what they did was through use of intimidation, through lawyers, they took a bankrupt man who had no money, who had nothing. He says the right to sue was transferred in 2000. The right to sue was not transferred in 2000. To get back to that, if Your Honor wants to discuss that security interest for a moment, they did not seek in discovery at any time. Okay. Let's assume that that language is open to a different interpretation. If, in fact, that document should have been produced, would it have affected? It would not have affected anything because, in fact, what they're relying on is the 2006 security interest. There was no right to sue transferred in 2000, and in 2002 this lawsuit was filed. Furthermore, Your Honors, they were advised. Documents were produced in this litigate. It's not like no documents were produced concerning the security interest. They didn't ask for one request for a security interest. But guess what? Mr. Bell testified at length at trial about having to sell his right to future royalties, entering into a security interest. He testified at his deposition. He testified, we produced documents surrounding the security interest. They didn't ask one question in his deposition. They didn't ask one question at trial about any of it. They weren't concerned about it. They didn't raise it. You can't lose, not ask for documents in discovery, not question a witness about it at trial, have documents produced to you. They got the documents from the Secretary of State website in Arkansas. Under the Montgomery case, the Fifth Circuit held that where documents are available through another source, you cannot claim under Rule 60 some kind of fraud on the court to set aside a judgment. And the document that they're relying on was found by them publicly through the Secretary of State's office in Arkansas. It was available to them. They could have done it. We produced documents that referenced the security agreement. They showed no interest in it until they lost. And now they're throwing the kitchen sink at it and trying to claim that, well, this case should never have gone to trial. They have to litigate the case. They changed theories throughout this entire litigation. They keep changing theories. They've lost now, and they want to change theories again. And now they want to raise fraud on the court when they didn't do their job. They didn't ask for documents. They didn't ask for security interests. They didn't do anything. Let's say they do lose. One theory they didn't seem to abandon was the jury's told 50 percent. The jury's told 50 percent. So what I'm wondering is what authority do you have to allow your client to obtain ownership of tag teams 50 percent? Because they are the administrator under the recording, under Exhibit B, under the agreement. They are the administrator and have been assigned the right to collect all revenue. I mean, you've clearly read the cases. There is an old Second Circuit learned hand decision, the Monks decision, right, in their brief. Do you remember that decision? I'm not sure that I remember that decision. But here we have an assignment of, and they didn't object at trial to our argument that we should be getting 100 percent. They didn't object to this at trial. And the administrator, they have assigned the right to collect everything. Tag team has assigned the right to collect all money to Isbell, everything, as the administrator. Collect but not keep. Well, again, Your Honor, the question about keeping is how much money does tag team owe Isbell? So if tag team, if their balance is recouped, if the money that Isbell advanced them has been repaid, then, yes, they're entitled to their half. Who's getting the royalties now? Are there any royalties being paid? It's being basically nothing, any little bit that's come up is being, like, held. We've garnished. We've done different things. But quite frankly, monies are being held. We haven't collected anything as of yet. Okay, if I can, may I continue? Of course. Okay. All right. So let me discuss for a moment. So first point in my argument is that they have waived the right to claim this dual transfer, having never raised it before a trial, having never raised it in a motion, having not raised in their 50A motion, they've waived the right to raise it now. And to claim that, well, we didn't know we were supposed to raise it until after we lost, quite frankly, if they thought it was a dual transfer, if they thought that Bellmark, that Isbell Albert had 50% and the other 50% was theirs, they should have raised that. But they can't say Albert owns zero, Bellmark had 50%, and for 10 years of litigation, send letters threatening Albert if he claimed any portion of the composition, and then after they lose, say, okay, if you own 50%, then it's a dual transfer and we get the other 50%. Rule 50, the law is clear why you can't do that, because if you change theories after a trial, it doesn't give the court the ability to review it that way. The party is prejudiced because they don't put on evidence that way. And here, they stake their fork in the ground, and that's the argument they made, that Albert had zero, and they lost, and they can't change their theory now. But I do want to point out that even if we looked at Exhibit B and the recording agreement, it's very clear that there was no assignment to Bellmark in the recording agreement. And your best case from our circuit on the waiver in this context? I have it. You have it. It's in the brief. Okay. Yes, I have it. It's in my brief. So as far as the actual contract is concerned, I think it's very important to look at a few things. So the recording agreement is between Bellmark and between Tag Team. Where there is an assignment to Bellmark in the recording agreement, the contract is very clear. So Bellmark is defined as Bellmark Records in the second paragraph of the recording agreement as us, we, our, or company. In paragraph 2, IIIC, the recording agreement says the master recordings are being transferred to company. That would be Bellmark Records. In paragraph 1, it talks about Bellmark Records owning the master recordings. But in paragraph 18C, which is the transfer of the composition copyrights, there's no reference to Bellmark Records. There's no reference to company. There's no reference to us, we, our. It only says that for good and valuable consideration, 50% to the publisher's share of each controlled composition will be transferred pursuant to the terms and conditions of Exhibit B. No reference whatsoever to Bellmark or any company that's defined as Bellmark Records. And so the agreement knows full well how to transfer something to Bellmark Records, and it didn't do so here. And if you look at Exhibit B, and by the way, there's a controlled composition clause, which gives the Bellmark Records the right to sell master recordings containing the composition. If there was a transfer of the compositions to Bellmark Records, there would have been no need to have a controlled composition clause because then they would own the compositions. And then if you look at Exhibit B, it's actually not two paragraphs. It's one sentence. There's only one transfer, and the transfer is to Bellmark's affiliated designee publisher. It then says, whoomp, there it is, and then it continues. But it's only one sentence. It's one paragraph. And the reason why it's written in that way is because it says that it's subject to the terms and conditions of the recording agreement, which contains the controlled composition clause. That's why it's written that way. I don't know that this is necessary given what we've been talking about today, but I do want to talk about very briefly the fact that also under California law, what the court says is that the paramount consideration for the interpretation of contracts is the intention of the contracting parties as it exists at the time of contracting. And any ambiguity in contracts must be interpreted to effectuate the party's intent at the time the contract was entered into. The only testimony in this record about the party's intent at the time of contracting is Al Bell. They had Tag Team available to them. They could have called them to testify about the party's intent. Al Bell testified that he spoke to Tag Team. He explained Exhibit B to them, that Albert Muzik owned 50 percent, that they would have 50 percent, and all parties agreed. That is the undisputed and only evidence in this record. The ownership of this song, you've already been up and back down from our court twice to try to clarify who owns this song, isn't it? Wasn't there a remand, two remands? No, there was one. And what happened was during the course of the trial, during the course of the matter, Al entered into an agreement with a third party who was assisting him in connection with financial obligations with respect to the litigation. And there was an assignment between the two of them, and so the court initially said that that deprived Al of the right to move forward. We appealed that, and the court reversed and said that that agreement didn't do so, and so then we went back. But I do want to talk about very briefly— The $166,000 for the assets, what did they get? They got the master recordings, which are very valuable. That's what Bellmark Records owned. Bellmark Records is a record company. In the music business, record companies own master recordings, publishers own compositions. In this case, Bellmark Records owned the master recordings. They got very valuable master recordings that are worth far in excess of $166,000. They have collected millions of dollars on the master recordings that they purchased for $166,000. Very briefly, because I do want to get this in, this is a mixed question of fact and law, and the court did hear 11 days of testimony, and there actually is no extrinsic testimony, post-extrinsic testimony that supports them at all. So let me just—I want to run through a litany of things that I've mentioned in my brief. Albert registered WUMP with BMI, not Bellmark. Payments for all compositions that came to him went to his personal Social Security number. Albert licensed the composition to DM Records, and they listed Albert Music as the owner of the publisher, not Bellmark Records. There are 33 licenses, all Albert Music of the composition. In the bankruptcy, Albert testified that he owned the composition, not Bellmark Records. Albert is listed as a creditor in the Bellmark bankruptcy. Albert filed the recordation of the compositions in the Copyright Office. Every mechanical license is from Albert Music, meaning every time the composition is licensed, it's Albert Music. DM's own records list Albert Music as the owner of the composition when they licensed it before the bankruptcy. The bankruptcy trustee never once licensed a musical composition, only the master recordings. Al Bell personally paid a judgment when the composition was sued upon for infringement. He could have said, Bellmark owns it, it's in bankruptcy, I don't have to pay. And none of the issues raised, none of the supposed extrinsic evidence raised by DM contradicts or there's no conflicting extrinsic evidence. The Court listened to 11 days of testimony, heard all of the evidence, looked at the contract, and ruled appropriately. Thank you, Your Honors. All right, thank you. All right, you have five minutes for rebuttal, Mr. Brown. First, one thing I would like to say to get it out of the way is that the record of this trial is exactly what we're hearing more of today, and that DM is constantly portrayed as a thief and a robber to extreme degrees. And I would like to point out the fact that the evidence actually shows that a lot of the things that are criticized about DM's behavior are not actually that. They're actually the contrary. The fact that DM, before they bought Bellmark, licensed the composition because they didn't own it then. And we've all been in the situation where someone does work for you or you go to a place to pay money and you say, you know, who should I make the check out to? Remember, we have Al Bell with all these different names, and he never goes by the same name twice. So we have Albertus Isbell that owns Isbell Records, which the DBA is Bellmark, and then we have Al Bell also being Albert Music, et cetera, et cetera. So I don't think it's fair to criticize people for cutting checks to who they were directed to cut them to as they had bargained to do. I don't think that's anything that implies anything more interesting than that. What I would like to say on the law is, number one, when you read the Morey case, it can't possibly be that California law is just limited to foundational facts that are as of the time of the contract because Morey specifically says that what they're giving effect to is determined by objective manifestations of the party's intent, including the words used in the agreement, as well as the extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract, the object nature and subject matter of the contract, and the subsequent conduct of the parties. And it cites Civil Code 1635 to 1656 and a whole litany of cases underneath it. And so it's absolutely impossible that the court could be directing us and California Civil Code could be directing us to limit our consideration to the signing of the contract when subsequent conduct is one of the specifically enumerated factors. So that extrinsic evidence that there's an attempt to disqualify it based upon the fact that it was not at the time of the signing of the contract, it's not a fair attempt to disqualify that evidence. It's something the jury should consider. It's interesting when you hear that one of the things I just heard, that Al Bell had testified at trial that he had to sell his rights to future royalties. That's an interesting statement because that fits exactly with those assignments. It is a sale, and it totally explains why it is that Al Bell entered into those assignments. But at trial, he was not saying, oh, I've sold all my rights to this. Believe me, ears would perk up at that point. We had already been on an appeal on this. He was saying, I own it, I own it, you know, and woe is me, all these horrible things. But in reality, the sale is exactly what the facts of the matter are. When it comes to tag team, classic example of why it is that Bellmark is the real party here. As soon as there's a second discussion of paying tag team anything, the announcement is, but they're unrecouped. Well, unrecouped as to who? Bellmark, and then Bellmark's successor, DM, not as to Al Bell. And so as a practical matter, if Al Bell really had any rights in this transaction, you know, he basically, there's no provision in there that calls for any recoupment at all in favor of Bell. And so to say that basically we don't have to pay them anything because they are not recouped indicates in reality Al Bell is not the proper party, and it actually is Bellmark. Because recoupment are the money's advance, and it's very specific in the memorandum agreement, the money's advance by Bellmark, not money's advance by any other unknown person. And so those rights transfer directly to DM with what they bought. When it comes to whether we raised the 50% issue, the second and 50%, during the course of the Rule 50 arguments at trial, the court raised it himself and looked at that provision as was it just boilerplate. The parties made their best argument. The court never interpreted it and never asked the jury to interpret it. And our limitation is not just the scope of our Rule 50A at trial. Post-trial we filed 50B and 59. It's a broader scope, and there's not a word in the brief about the breadths of the 59 motion. We cite case law in our brief that ambiguity in California is interpreted against the drafter. The drafter is Al Bell. So if anybody has to lose based on ambiguity, it should be Al Bell. Thank you, Your Honors. All right. Thank you.